UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

DANIEL A. BRNA, RAMON FERNANDEZ
and JAMES E. SCOTT, on behalf of
themselves and all others similarly situated,   CASE NO. 17-60144-CIV-MORENO
        Plaintiffs,

v.

ISLE OF CAPRI CASINOS, INC. AND
INTERBLOCK USA, LLC,

        Defendants.
_____/

## PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT WITH INCORPORATED MEMORANDUM OF LAW

      Plaintiffs and their counsel hereby move, without opposition, for final approval of a class action settlement that will provide direct monetary relief to a class of casino patrons who placed a particular bet on electronic gaming machines that were manufactured by Defendant Interblock USA L.C. ("Interblock") and were available for play at Defendant Isle of Capri Casinos, LLC's ("IOC") casino in Pompano Beach from July 8, 2015 to January 22, 2017.  The settlement was preliminarily approved by order of this Court dated November 17, 2017.  (D.E. 73)   To avoid duplication, Plaintiffs incorporate by reference their previously-filed motion for preliminary approval and supplement thereto.  (D.E. 68 & 72)  Those filings have already addressed a variety of matters relevant to a final-approval order, including but not limited to: (a) the grounds for certification of the settlement class, (b) the contents of the notices to class members and releases to be provided, and (c) details about the class representatives and the qualifications of class counsel.  Following entry of the Court's preliminary-approval order (D.E. 73), the Class Administrator retained by the parties sent timely notice to approximately 6,000 IOC "Fan Club" members in the required format and method of delivery that was approved by the Court.  The

1

deadline for class members to object to or opt out of the settlement expired on January 19th, and, to date, ***the Class Administrator has not received any opt-outs or objections to the settlement.*** As explained below, final approval is now appropriate under the applicable standard in this circuit for showing that the settlement is fair, reasonable, and adequate.

## MEMORANDUM OF LAW

### BACKGROUND

#### I

#### *Summary of Litigation*

This class action against Defendants IOC and Interblock (the manufacturer of the electronic gaming machines at issue) was filed in January of 2017. The complaint alleged that Interblock's G4 Organic Dice machines—which offered casino patrons the opportunity to play electronic versions of craps, roulette and sic bo—charged IOC's Fan Club members who played craps a commission on winning "buy bets" in excess of the amount authorized by the casino's published rules.[1] For example, the complaint alleged that if a Fan Club member placed a $20 "buy bet" on the number 8 and won the bet, he or she was charged a commission of $1.20 instead of a proper commission of $1.00. The complaint asserted four claims -- breach of contract, breach of implied covenant of good faith and fair dealing, unjust enrichment, and violations of the Florida Deceptive and Unfair Trade Practices Act. (D.E. 1) Defendants denied liability and asserted numerous defenses. Intense discovery ensued through August of 2017, including the production and review of thousands of documents and extensive computer gaming data, the holding of nearly a dozen depositions in Florida and Nevada, and the testing and inspection of the gaming machines and

---

[1] The complaint was directed only at "buy bets" in the game of craps; the complaint did not allege that Fan Club members were overcharged while playing roulette or sic bo. The limited historical data that was available for the Organic Dice machines showed that approximately 35% of the game activity on the Organic Dice machines did not involve Craps.

2

software at the offices of an independent gaming test lab in Nevada. Plaintiffs also retained the services of an expert in casino gaming and computer engineering. Motion practice also ramped up, with Plaintiffs filing multiple motions to compel and Defendants filing a motion seeking final summary judgment in their favor on all four claims. (D.E. 31, 36, 47) While those motions were pending, the parties participated in a formal, full-day mediation with Rodney Max as mediator, at the conclusion of which a settlement in principle was reached as to the material settlement terms. The following week this Court was advised about the settlement (D.E. 65), and as noted preliminary approval was granted on November 17th, 2017. (D.E. 73)

## II

### *Summary of Relief Afforded by Settlement*

The settlement agreement is in the court record at D.E. 68-1. If approved, the settlement will provide valuable benefits in the form of monetary relief to members of the class, which is defined as:

> IOC Fan Club members who played the game of craps on Interblock's Organic Dice machines at IOC's Pompano Park casino and placed a winning "buy bet" during the class period of July 8, 2015 to January 22, 2017.[2]

According to the Fan Club records, approximately 6,000 Fan Club members inserted their membership card to play the Organic Dice machines at the Pompano Park casino during the class period and were, therefore, potentially eligible to claim settlement relief in this case upon certifying that they placed winning buy bets while playing craps during the class period.[3] The settlement affords every member of the settlement class the opportunity to receive direct monetary relief in

---

[2] Excluded from the settlement class are (a) officers, directors, and employees of IOC, Interblock and their parents and subsidiaries; and (b) judicial officers and employees of the Court.

[3] While IOC's records identified which Fan Club members played the Organic Dice machines at the Pompano Park casino during the class period, the records did not show which game they played (*i.e.*, craps, roulette or sic bo). Consequently, Fan Club members who received notice of the settlement were asked to submit a signed certification attesting that they played craps and placed winning "buy bets."

3

the form of a settlement check in the amount of $15 or, if the participation rate in the settlement does not exceed 17.5%, then each eligible class member will instead receive the increased amount of $30. Consequently, the settlement class was entitled to receive as much as $90,000 in aggregate monetary relief, plus the additional value derived from Defendants' agreement to pay all costs of class administration and all costs of mediation.

## III

### *Summary of Class Notice and Administration*

In connection with this motion, Class Counsel has provided the Court with a Declaration from JND Class Action Administration, the independent third-party Settlement Administrator for the Settlement. (Exhibit 1, Declaration of Jennifer M. Keough). Along with additional details regarding the process, the Declaration establishes that the Notice, Claim Form, and Claim Form instructions were delivered to the eligible members of the settlement class by email on November 27, 2017 and again on January 11, 2018, by first-class mail to those with invalid or no email address on December 4, 2017, and that the Settlement Website was established on November 27, 2017. (Decl. ¶¶ 5-9) The Settlement Website at www.organicdicesettlement.com provides an additional means for Settlement Class Members to make claims and to obtain notice of, and information about, the Settlement. Settlement Class Members can upload claim forms and submit their claims electronically through the Settlement Website. Persons who wished to object to the Settlement or to be excluded from the Settlement Class were provided an opportunity to do so as described in the Notice and on the Settlement Website. (Decl. ¶¶ 10-11) The Settlement Website also maintains hyperlinks to the Settlement Agreement, the Long-Form Notice, the Preliminary Approval Order, and other documents which Settlement Class Counsel and counsel for Defendants agreed to post, and answers to frequently asked questions about the settlement, its terms, and the

procedures for filing a claim, opting out, and objecting. These documents remain on the Settlement Website until the Final Accounting. (Decl. ¶ 11) Accordingly, adequate Class Notice was given to the Settlement Class in compliance with the Settlement Agreement and the Preliminary Approval Order.

As reflected in the Declaration provided by the Settlement Administrator, claims were received, processed, and validated in accordance with the terms of the Settlement Agreement and Preliminary Approval order. (Decl. ¶¶ 16-20) Class Counsel will continue to work with the Claims Administrator to complete the process and assure that class relief is provided to the Settlement Class, in accordance with Court direction.

In addition, Defendants have complied with all notice obligations under the Class Action Fairness Act, 28 U.S.C. §§ 1715, *et seq.*, in connection with the proposed Settlement.

## *ARGUMENT*

To put this motion in perspective, courts have routinely recognized that in the specific context of class action litigation, settlement can be particularly beneficial to all concerned. This is because class actions, by their very nature, are fraught with "notable uncertainty, difficulties of proof, and length." *See, e.g.*, *Turner v. Gen Elec. Co.,* 2006 WL 2620275, at *2 (M.D. Fla. Sept. 13, 2006). Moreover, settlements in this context "contribute greatly to the efficient utilization of scarce judicial resources, and achieve the speedy resolution of justice." *Id.* As such, "[p]ublic policy strongly favors the pretrial settlement of class action lawsuits." *In re U.S. Oil & Gas Litig.,* 967 F.2d 489, 493 (11th Cir. 1992).

At this juncture, the court is "not called upon to determine whether the settlement reached by the parties is the best possible deal, nor whether class members will receive as much from a settlement as they might have recovered from victory at trial." *See Gevaerts v. TD Bank, N.A.,*

2015 WL 6751061, *5 (S.D. Fla. Nov. 5, 2015). Rather, as this Court has previously recognized, the objective at this final-approval stage is simply to ensure that the class action settlement terms are "fair, reasonable, and adequate." *See Circeo-Loudon v. Green Tree Servicing*, 2016 WL 8256853, *1 (S.D. Fla. Aug. 30, 2016) (Moreno, D.J.); *Almanzar v. Select Portfolio Servicing, Inc.*, 2016 WL 1169198, *1 (S.D. Fla. Mar. 25, 2016) (Moreno, D.J.); *Hall v. Bank of America, N.A.*, 2014 WL 7184039, (S.D. Fla. Dec. 17, 2014) (Moreno, D.J.); *see also In re: Takata Airbag Products Liability Litigation,* 2017 WL 5706147, *3-4 (S.D. Fla. Nov. 1, 2017) (Moreno, D.J.), *appeal pending sub nom., Budgen v. FAC US LLC*, No. 17-15382 (11th Cir. filed Nov. 28, 2017). To accomplish that objective, courts in this circuit routinely evaluate the following six factors in resolving such a motion:

(1) The existence of fraud or collusion among the parties in reaching the settlement;

(2) The complexity, expense and duration of the litigation;

(3) The stage of proceedings at which the settlement was achieved and the amount of discovery completed;

(4) The probability of the plaintiffs' success on the merits;

(5) The range of possible recovery; and

(6) The opinions of class counsel, the class representatives, and the substance and amount of opposition to the settlement.

*See Wilson v. EverBank*, 2016 WL 457011, *6 (S.D. Fla. Feb. 3, 2016), *citing, Leverso v. S. Trust Bank of Ala., N.A.* 18 F. 3d 1527, 1630 n.6 (11th Cir. 1994). As explained below, each and every factor overwhelmingly favors final approval in this case.

**A.**   <u>*No Fraud or Collusion*</u>

As the courts in this district have repeatedly recognized, "[t]here is a *presumption of good faith* in the negotiation process" and "[w]here the parties have negotiated at arm's length, the Court

should find that the settlement is not the product of collusion." *Wilson*, *supra* at *6 (emphasis added); *see also Saccoccio v. JPMorgan Chase Bank, N.A.*, 297 F.R.D. 683, 692 (S.D. Fla. 2014). That is precisely the situation here. The settlement reached in this case was the product of significant give-and-take by both sides and was negotiated at arm's length with the benefit of both extensive discovery having been completed and a top-notch mediator overseeing the negotiations. That process culminated in a favorable settlement for the class, and *not a single class member has objected.*

A few additional words should be said here about the particular mediator who was involved here and the mediation process itself. On the first point, this case was mediated by Rodney Max, who is not only well known for mediating class actions but who has been recognized in this district as "probably one of the top mediators in the country." *Lee v. Ocwen Loan Servicing, LLC*, 2015 WL 5449813, *11 (S.D. Fla. Sept. 14, 2015).[4] His very involvement has repeatedly led courts in this jurisdiction to flat out reject any notion that a resulting settlement was the product of collusion. *Id.*; *accord Wilson*, *supra* at *6 (recognizing Rodney Max as a "nationally renowned mediator" whose very involvement weighs in favor of settlement approval); *Curry v. AvMed, Inc.,* 2014 WL 7801286, *2 (S.D. Fla. Feb. 28, 2014) (favorably observing that class settlement negotiations were "presided over by the highly experienced third-party neutral Rodney A. Max"); *Saccoccio, supra* at 692 (also finding no collusion when case was mediated by Rodney Max).[5]

---

[4] Max's biography and qualifications are available at https://www.uww-adr.com/biography/rodney-a-max.

[5] *See generally Poertner v. The Gillette Co.,* 618 Fed. Appx. 624, 630 (11th Cir. 2015) (fact that class action settlement was achieved only after engaging in extensive arms-length negotiations moderated by an experienced mediator belies any suggestion of collusion); *Almanzar*, *supra* at *1 (entering final approval of settlement where class action had been mediated and all counsel at that time were "well-positioned to evaluate the benefits" of settlement).

As for the process, the parties in this case participated in a full-day, in-person mediation session with Max on August 30th, and Max also had separate discussions by telephone with each party's counsel. By that time, there had already been an *extensive* production of documents, nearly a dozen depositions taken, and significant motion practice -- including the filing of Plaintiffs' motions to compel and Defendants' motion for summary judgment on every claim asserted. As such, the parties were well-informed as to strengths and weaknesses of their respective positions when they appeared before Max. As the court observed in *Lee,* parties in a class action would hardly need to retain the services of any neutral third party (much less one of Max's stature) if they were colluding in a settlement. *Lee, supra* at *11. Given the presumption of good faith and the circumstances of the mediation here, this first factor overwhelmingly supports final approval of the settlement.

**B.**     ***Complexities, Expense and Duration of Litigation***

As *Wilson* teaches, this factor supports approval where the claims are complex and litigating them to a final resolution would prove difficult, time-consuming and expensive. *Wilson, supra* at *7. That is truly the situation here. This case -- which involves electronic gaming devices with complex internal software -- is highly technical in nature and had not been previously litigated. As a matter of first impression, there was no guarantee of success even in the best of circumstances. But two things were cause for concern by the Plaintiffs. First, by the time of mediation Plaintiffs were facing a motion for summary judgment in which Defendants attacked all theories asserted but also sought recovery of their legal fees under the statutory fee provision. And second, Plaintiffs were facing evidentiary challenges at trial, particularly in connection with their damage claims. The problem stemmed from the limited data that is routinely maintained inside the gaming machines. While Plaintiffs might have tried to prove damages through extrapolation

or other statistical techniques, there was risk in applying such methods to this type of situation, and attempting to do so through experts would likely have involved a battle of the experts that would have involved costly and time-consuming *Daubert* challenges. Indeed, one of Defendants' arguments in favor of summary judgment was that the class representatives could not carry their burden of proof on damages. Faced with these obstacles -- and the possibility that Plaintiffs might end up with no recovery in the end -- Plaintiffs viewed this case as risky for trial and ripe for settlement.

Under those circumstances, the decision to settle the matter and secure prompt monetary relief for the class members was both reasonable and responsible. Such circumstances weigh heavily in favor of final settlement approval under the second factor. *See Wilson, supra* at *7; *see also Hall*, *supra* *4 (second factor favors approval where settlement provides immediate monetary relief, yet continuing to litigate could "go on for years" with uncertain results); *Circeo-Loudon*, *supra* at *1 (approving final settlement of class action where parties were "well-positioned to evaluate the benefits of the Settlement Agreement, taking into account the expense, risk, and uncertainty of protracted litigation with respect to numerous difficult questions of fact and law").

C.      *Stage of Proceedings/Discovery*

As *Wilson* explains, this third factor simply seeks to ensure that settlement is reached at a point when "Plaintiffs had access to sufficient information to adequately evaluate the merits of the case and weigh the benefits of settlement against further litigation." *Wilson*, *supra* at *7. Again, this is more than adequately satisfied. As noted, settlement was reached in mediation *after* all critical discovery had been completed over the course of approximately nine months, which included: (a) exchanging Rule 26 disclosures; (b) serving and responding to interrogatories; (c) serving public records requests on Florida's casino regulators; (d) producing and reviewing

9

thousands of documents and extensive Fan Club and gaming data; (e) taking nearly a dozen depositions in Florida and Nevada (including key witnesses with knowledge of the operation, maintenance, and data relating to the Organic Dice machines); and (f) inspecting and testing the Organic Dice machines at a casino gaming lab in Nevada. Plaintiffs also retained the services of Mark Nicely, an expert witness in the area of casino gaming and gambling. Simply put, they settled at a point in time when they had obtained and evaluated the relevant evidence and were *very* well-informed of the risks going forward versus the benefits of settling. Such circumstances fully support the third factor. *See, e,g., id.*; *see also Circeo-Loudon*, *supra* at *1; *Almanzar*, *supra* at *1.

D.  <u>*Significant Risk in Probability of Success*</u>

As *Wilson* reflects, this fourth factor examines whether there was a possibility that the Plaintiffs might recover nothing if litigation had proceeded. In that case, the court essentially found that the very fact the plaintiffs would be facing opposition to their motion for class certification, a motion for summary judgment being filed against them, a lengthy trial, and a possible appeal was sufficient to support this factor. *Id.* at *8; *see also Gevaerts*, *supra* at *7 (also noting the additional risk of an interlocutory appeal on class certification). Here, Defendants' motion for summary judgment was *already on file*, and every one of the other risks was equally probable. In addition to moving for summary judgment, Defendants' counsel informed Plaintiffs that they were going to oppose class certification. Coupled with the fact that there was limited gaming data available, there was no guarantee of class certification or a recovery at the end of a trial in this case and even if Plaintiffs could have prevailed, an appeal would have almost surely followed. This type of situation strongly supports the fourth factor. *See, e.g., Hall*, *supra* at *4 (final approval appropriate where plaintiffs faced "headwinds" and "the class could ensure a long

10

and expensive trial only to come away with nothing"); *see also Carter v. Forjas Taurus S.A.*, 2016 WL 3982489, *10 (S.D. Fla. July 22, 2016) (approving class settlement where no amount of recovery was guaranteed by litigating claims through trial), *aff'd,* 701 Fed. Appx. 759 (11th Cir. 2017); *Gevaerts, supra* at *7 ("[g]iven the myriad risks attending these claims, as well as the certainty of substantial delay and expense from ongoing litigation, the Settlement cannot be seen as anything except a fair compromise").

E.  *Relief Within Range of Possible Recovery*

In *Wilson*, the court observed that in examining this factor, the court must not "engage in a claim-by-claim, dollar-by-dollar evaluation, but rather, [must] evaluate the proposed settlement in its totality." *Wilson*, *supra* at *8. This necessarily includes taking into account a potential "finding of non-liability" and "the risks of continued litigation." *Id.* at *8, *10. As noted, a recovery of nothing at all (or the reversal of an award on appeal) was quite possible in light of the limited gaming and player data and the pending motion for summary judgment. So, the very fact that this settlement affords as much as $90,000 in prompt monetary relief to the class as a whole necessarily makes this a *far* more attractive result than what they might otherwise face after trial and an appeal. Even if a greater recovery could have been hoped for at trial, the downside was not worth taking the chance given all of these headwinds. Accordingly, the fifth factor likewise supports final approval. *See, e.g., Gevaerts, supra* at *5 (reasonable settlement does not require "best possible deal" or that class members "receive as much from a settlement as they might have recovered from victory at trial"); *see also Behrens v. Wometco Enterprises, Inc.*, 118 F.R.D. 534, 542 (S.D. Fla. 1988) (finding settlement reasonable even though "$.20 a share is a small fraction of the desired recovery of $3.50 a share" because "settlement can be satisfying even if it amounts to a hundredth or even a thousandth of a single percent of the potential recovery").

F.   *Support for Settlement*

On this final factor, the court examines the level of support that the settlement has received from class counsel, the class representative, and the class members.  *Wilson*, *supra* at *12; *Hall*, *supra* at *5.  Such support in this case is *unanimous*.  Not a single class member has objected.  Not a single class member has "opted out" of the settlement.  Such facts weigh strongly in favor of approval on this sixth factor.  *Gevaerts*, *supra* at *8.

Moreover, the settlement agreement itself is the memorialization of the very terms that class counsel and the class representatives deem to be fair, reasonable and adequate and in the best interest of the class given the riskiness of going forward.  As the court in *Gevaerts* observed, not only should the court give "great weight to the recommendations of counsel for the parties, given their considerable experience in this type of litigation," but it is also logical to assume that "[i]f plaintiffs' counsel did not believe these factors all pointed substantially in favor of this settlement as presently structured, … they would not have signed their names to the settlement agreement."  *Gevaerts*, *supra* at *8 (citation omitted); *see also In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1351 (S.D. Fla. 2011) ("[i]n determining whether to approve a proposed [class action] settlement, the Court is entitled to rely upon the judgment of the parties' experienced counsel").  Like all of the other factors in the applicable analysis here, this factor *strongly* favors final approval of the class action settlement in this case.

## CONCLUSION

Based on the foregoing, Plaintiffs request that the court enter an order which: (1) grants final approval of (i) the certification of the settlement class, (ii) the designation of the class representatives, and (iii) the designation of class counsel, all as conditionally approved in the preliminary-approval order; (2) grants final approval of the settlement as fair, reasonable, and

adequate to the settlement class; (3) provides for the release of all released claims and enjoins settlement class members from asserting, filing, maintaining, or prosecuting any of the released claims in the future; (4) orders the entry of judgment for Defendants on all claims, causes of action, and counts alleged in the lawsuit, and incorporates the releases and covenant not to sue stated in the settlement agreement, with each of the parties to bear its or his own costs and attorneys' fees, except as provided in Section 10 of the settlement agreement; (6) authorizes Defendants to pay (i) valid claims approved by the settlement administrator in accordance with the terms of the settlement agreement, (ii) the incentive awards to each plaintiff, and (iii) the fees/costs to Class Counsel as approved by the Court; and (7) preserves the Court's continuing jurisdiction over the administration and enforcement of the settlement agreement.

  **WE HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished electronically this 26th day of January, 2018 to the counsel on the attached service list.

            **Kelley Uustal, PLC**
            500 North Federal Highway, Suite 200
            Fort Lauderdale, Florida 33301
            Telephone: (954) 522-6601
            Facsimile: (954) 522-6608
            By: /s/ *Cristina M. Pierson*
            Cristina M. Pierson, Esq. (FBN 984345)
            cmp@kulaw.com

            and

            **Daren Stabinski P.A.**
            700 SW 78th Ave., #916
            Plantation, FL 33324
            Telephone (954) 540-9517
            By: /s/ *Daren Stabinski*
            Daren Stabinski, Esq. (FBN 2951)
            daren@tenderbox.tv

## SERVICE LIST

**BECKER & POLIAKOFF, P.A.**
*Attorneys for Defendant Isle of Capri, Inc.*
1 East Broward Blvd., Suite 1800
Ft. Lauderdale, FL 33301
Telephone: (954) 985-4133
Facsimile: (954) 985-4176
Gary C. Rosen, Esq. (FBN 310107)
grosen@bplegal.com
Daniel L. Wallach, Esq. (FBN 540277)
dwallach@bplegal.com

**HOLLAND & KNIGHT LLP**
*Attorneys for Interblock USA L.L.C. and Isle of Capri Inc, n/k/a Isle of Capri LLC.*
701 Brickell Avenue, Suite 3300
Miami, Florida 33131
Telephone: (305) 374-8500
Facsimile: (305) 789-7799
Stephen Warren, Esq. (FBN 788171)
Email: stephen.warren@hklaw.com
Allison Kernisky, Esq. (FBN 41160)
Email: allison.kernisky@hklaw.com